# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MORGAN PATTERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:24-cv-00002** |
| | ) | |
| **SPRIGGS CONSTRUCTION, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Morgan Patterson ("Patterson") worked at Spriggs Construction, LLC ("Spriggs") as a construction manager before Spriggs terminated her employment. In this action, Patterson challenges her termination and other conduct under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u> ("Title VII"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, <u>et seq.</u> ("THRA"), the Tennessee Disability, Act, Tenn. Code Ann. § 8-50-103, <u>et seq.</u> ("TDA"), the Americans with Disabilities Act, 42 U.S.C. § 1202, <u>et seq.</u> ("ADA"), and the Tennessee Pregnant Workers Fairness Act, Tenn. Code Ann. § 50-10-101, <u>et seq.</u> ("TN PWFA"). In particular, she alleges pregnancy-based and disability-based discrimination, retaliation, and a failure to accommodate her disabilities when Spriggs fired her one day after she sought reasonable accommodations for her pregnancy. Now before the Court is Spriggs's Motion for Summary Judgment (Doc. No. 35), which has been fully briefed and is ripe for review (<u>see</u> Doc. Nos. 35–41, 44–45). For the following reasons, Spriggs's motion will be denied.

## I. BACKGROUND AND UNDISPUTED FACTS[1]

Patterson began working at Spriggs on May 2, 2022, as a workflow supervisor. (Doc. No. 39 ¶ 1). A month later, she became pregnant but suffered a miscarriage. (Id. ¶ 9). She informed Spriggs of her miscarriage and sought treatment. (Doc. No. 37-1 at 86:9–87:25). For reasons that are disputed, Spriggs laid Patterson off from work in August 2022. (Doc. No. 39 ¶ 11).

Spriggs rehired Patterson as a construction manager on November 28, 2022. (Id. ¶ 16). Patterson became pregnant again. (Id. ¶ 23). On February 13, 2023, Patterson told Jimmy Spriggs, the owner of Spriggs (Doc. No. 1 ¶ 17), about her pregnancy. (Doc. No. 39 ¶ 26). In response, Jimmy Spriggs congratulated her, went to lunch with her, and informed her that she "would be able to work from home" and that "he would accommodate [her] basically having kids[.]" (Id. ¶ 27).

Patterson was diagnosed with chronic hypertension in early 2023 by her OBGYN. (Id. ¶ 28). Nevertheless, she continued working. During that time, various issues related to her work arose, which are in dispute. For instance, Spriggs contends that on March 8 and 9, 2023, Patterson failed to properly manage subcontractor billing procedures (id. ¶ 30), yet Patterson contends it was really her supervisor, Ken Rector, and the office manager, Wendy Russel ("Russel"), (Doc. No. 1 ¶ 26), who had the authority and responsibility for such procedures and related errors. Rector, in fact, confirmed Patterson had no issues with billing at that time. (See, e.g., Doc. No. 41-4 at 89:18–23).

---

[1] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 39, 45), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record. To the extent Patterson objects to Spriggs's statements of facts on admissibility grounds, the Court has considered them and has only credited them to the extent appropriate.

Spriggs identifies other issues with Patterson's performance. For instance, it blames Patterson for a significant loss related to an AT&T contract. (Doc. No. 39 ¶¶ 31, 32). Patterson presents evidence that she had no involvement with the billing process on that contract, and was not responsible for the subcontractor work stoppage. (Doc. No. 37-1 at 140:19–141:3, 142:6–7). Spriggs also points to an interaction between subcontractor Andy Sumahit's ("Sumahit") and Rector where Sumahit expressed confusion and frustration about billing procedures under the same contract. (Doc. No. 39 ¶ 35). The parties, again, dispute whether this confusion stemmed from Patterson's or Jimmy Spriggs's work. (See id.).

According to Spriggs, Patterson continued to have problems at work. Spriggs presents evidence that on March 24, 2023, AT&T rejected Patterson's data submission as "not usable" (Doc. No. 37-3 ¶ 18), but Patterson points to Russel's deposition testimony showing that this issue resolved. (Doc. No. 41-1 at 38:8–22). On April 4, 2023, AT&T's formal evaluation documented Patterson's work at 81% accuracy, below the contractually required 95%. (Doc. No. 39 ¶ 46). Further, on April 11, 2023, Spriggs points to evidence that Patterson approved incorrect billing codes, which she disputes. (Doc. No. 37-4 at 204:9–12, 205:10–17).

On April 13, 2023, Patterson requested time off work for pregnancy-related health reasons. (Doc. No. 39 ¶ 65). In an email, Patterson told Russel: "After sitting in the doctor's office for 3 hours and failing my glucose test and high blood pressure, I am going to take PTO to try and get it regulated." (Id.). Patterson indicated that she would send a doctor's note later that day to support her accommodation request. (Id.). Patterson sent Russel the doctor's note, which stated: "Please excuse [Patterson] from work for up to seven days as she deems necessary." (Id.). Russel forwarded that correspondence to Jimmy Spriggs at 6:48 p.m. (Doc. No. 41-14 at 2), who read it around 7:00 p.m. that day. (Id.).

3

The parties dispute whether Jimmy Spriggs made the decision to terminate Patterson's employment prior to, or after, receiving her PTO request on April 13, 2023. (Id. ¶¶ 65, 69; see Doc. No. 45 ¶ 9). Either way, on April 14, 2023, Jimmy Spriggs terminated Patterson's employment at Spriggs, stating via email:

> Morgan,
>
> I see below that you are out today. I told you I wanted to finish up our conversation but I feel as though you are avoiding it.
>
> With all the things that have gone on and us having to correct it I believe it's best that we part ways. We are having to handle everything now and with the lack of communication coming from over there I don't feel it's a good situation for either of us.
>
> Please get with Michael so that we can get your computer and expense card.
>
> I would also like to make sure that the computer is the property of Spriggs Construction LL and nothing needs to be erased.
>
> Thank you[.]

(Doc. No. 41-14 at 1).

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element

4

of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

## III.    ANALYSIS

Spriggs argues it is entitled to summary judgment on the merits as to a portion of Patterson's claims:[2] (1) Patterson's pregnancy-based discrimination claims brought under Title

---

[2] Despite the parties being less than two months from trial, their briefing demonstrates confusion as to the full scope of Patterson's claims. This is likely due to Patterson's allegations, which often merge failure to accommodate, retaliation, and pregnancy/disability discrimination claims under single counts. (See, e.g., Doc. No. 1 ¶¶ 33–42). Perhaps because of this confusion, Spriggs fails to move for summary judgment on Patterson's retaliation claims in more than a perfunctory manner, as its mere references to "retaliation" three times do little to carry its burden under Rule 56. Knight v. Capital Partners Corp. v. Henkel AG & Co., KGaA, 930 F.3d 775, 780 n.1 (6th Cir. 2019) ("Judges are not like pigs, hunting for truffles that might be buried in the record.") (citation and quotations omitted). This is in violation of the Initial Case Management Order (Doc. No. 16) and this Court's preferences, providing a basis to deny Spriggs's motion outright. Judicial Preferences ¶ 4 (motions for partial summary judgment may be filed "only after permission is granted by the Court"); (see Doc. No. 36 (referencing retaliation only three times and failing to articulate the proper test for such claims)). However, given the discrepancies around the scope of

5

VII, the THRA, and the TN PWFA; (2) Patterson's failure to accommodate claims brought under

the ADA, the TDA, and the TN PWFA; and (3) the proper scope of back pay that Patterson may

recover. (See Doc. No. 36). The Court will address each claim.

1. Pregnancy-Based Discrimination Claims

Spriggs first argues that it is entitled to summary judgment on Patterson's pregnancy-based

discrimination claims brought under Title VII, the THRA, and the TN PWFA. The alleged

discrimination occurred when Spriggs terminated her for requesting a pregnancy-related

accommodation. (Doc. No. 36 at 5; see Doc. No. 1 ¶¶ 34–36, 44–46, 73–74). Because the

Tennessee "legislature intended the THRA to be coextensive with federal law," Phillips v.

Interstate Hotels Corp., 974 S.W.2d 680, 683 (Tenn. 1998), such "claims are analyzed in the same

manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner,

289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases). This includes, where applicable,

the McDonnell Douglas v. Green, 411 U.S. 792 (1973) burden-shifting framework that the

Tennessee legislature codified for all claims filed after June 10, 2010. Tenn. Code Ann. § 4-21-

311 (2011). Further, while Spriggs challenges Patterson's TN PWFA claim as a pregnancy

discrimination claim under McDonnell Douglas, it offers no case law supporting that argument.

Nevertheless, considering that the TN PWFA maps onto the federal Pregnant Workers Fairness

Act ("PWFA"), which references the ADA that follows the McDonnell Douglas burden-shifting

framework for indirect evidence cases, see infra, Section III.2, the Court will also consider

Patterson's TN PWFA pregnancy discrimination claim in conjunction with her Title VII claim

---

Patterson's claims, and to ensure judicial efficiencies for the upcoming trial, the Court will still
consider Spriggs's motion on the merits. With this in mind, the Court cautions the parties to work
diligently in the upcoming weeks to ensure that they agree on the number and nature of Patterson's
claims that will be presented at trial.

6

here. Accordingly, the Court will evaluate Patterson's Title VII, THRA, and TN PWFA pregnancy discrimination claims under the McDonnell Douglas framework.

Title VII and its state counterparts "prohibit[] an employer from discriminating against an employee 'because of sex,' which includes discrimination on the basis of pregnancy." Prebilich-Holland v. Gaylord Entertainment Co., 297 F.3d 438, 442 (6th Cir. 2002) (quoting 42 U.S.C. § 2000e(k)). Where a plaintiff does not have direct evidence of the pregnancy discrimination, like Patterson here, the claims are "analyzed under the McDonnell Douglas evidentiary framework, which requires that the plaintiff first establish a prima facie case of discrimination." Id. (citing McDonnell, 411 U.S. at 802–03). If Patterson can establish a prima facie case of pregnancy discrimination, the burden shifts to Spriggs to show a legitimate, non-discriminatory reason for Patterson's termination, and then back to Patterson to establish pretext. See McDonnell, 411 U.S. at 802–03. The Court will address each of these steps in turn.[3]

A. Prima Facie Case

"To establish a prima facie case of pregnancy discrimination, [Patterson] must show that '(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision.'" Prebilich-Holland, 297 F.3d at 442 (quoting Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000)); see Johnson v. Evolent Health, LLC, 2023 WL 2326676, at *4 (6th

---

[3] The Court acknowledges Patterson's citation to Justice Thomas's concurrence in Ames v. Ohio Dep't of Youth Servs., 145 S. Ct. 1540, 1548 (2025), where he calls into question the workability of the McDonnell Douglas framework at the summary judgment stage and urges district court judges to resolve summary judgment motions "by applying the straightforward text of Rule 56." Id. at 1555. Justice Thomas's and Patterson's points about the usefulness of the McDonnell Douglas framework are well-taken. Still, the Court finds it prudent to apply it here—albeit without rigidity—given that neither the majority in Ames, nor any controlling Sixth Circuit precedent instructs otherwise.

7

Cir. Mar. 2, 2023) (same). Spriggs correctly concedes that the first and third elements are satisfied, given that she was pregnant while working at Spriggs, and she suffered an adverse action there through her termination. (<u>See</u> Doc. No. 36 at 5). However, despite challenging the second and fourth elements of these claims, Spriggs only provides substantive argument on the fourth element of Patterson's prima facie case. (<u>See</u> <u>id.</u> at 5–9 (discussing arguments pertaining only to the fourth element)). Because Spriggs only contests the second element of Patterson's prima facie case in a mechanical fashion, the issue is deemed waived, and the Court need only address the parties' dispute over the fourth element here. <u>See</u> <u>McPherson v. Kelsey</u>, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting <u>Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n</u>, 59 F.3d 284, 293–94 (1st Cir. 1995)).

The center of the parties' dispute over the fourth prima facie element—whether there is a nexus between Patterson's pregnancy and Spriggs terminating her employment—centers around the timing of Patterson's termination. Spriggs argues that there is no genuine dispute of material fact that there is no nexus between Patterson's request for time off for her pregnancy complications and her termination, given: (1) Jimmy Spriggs made the decision to terminate Patterson's employment *prior* to receiving her pregnancy-related accommodation request on April 13, 2023; (2) temporal proximity alone is insufficient to otherwise establish causation; and (3) there is evidence that Spriggs treated a similarly situated pregnant employee favorably. (Doc. No. 36 at 6–9). Patterson disagrees with Spriggs's characterization of the record and characterization of its cited legal authority on this issue, arguing: (1) there is a genuine dispute of material fact on whether

8

Jimmy Spriggs decided to terminate Patterson before or after learning of her request for a pregnancy-related accommodation, (2) there is Sixth Circuit precedent establishing that temporal proximity alone may be sufficient to warrant a finding of causation for the fourth element; and (3) there is additional evidence showing Spriggs's discriminatory intent. (Doc. No. 38 at 7–9, 21–22). For the following reasons, the Court finds a genuine dispute of material fact on whether there is a nexus between Patterson requesting a pregnancy-related accommodation and Spriggs's decision terminating her employment the next day.

As an initial matter, the Court finds neither parties' arguments about whether Spriggs treated a similarly situated employee, Hannah Colton ("Colton"), differently than Patterson to be of any moment, given precedent that no such showing is necessary. See Prebilich-Holland, 297 F.3d at 442 (no comparator evidence required for pregnancy discrimination prima facie case). While some cases articulate this element as part of a general employment discrimination claim, see, e.g., White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008), the Court finds cases like Prebilich-Holland, which specifically address the pregnancy-related discrimination at issue here, to be more pertinent.[4]

Further, the non-binding, unpublished cases that Spriggs rely on in support of this argument, John v. Brooklyn Eye Cnty., 2025 WL 317515, at *9 (E.D.N.Y. Jan. 28, 2025) and Rios v. Leprino Foods Co., 2021 WL 4124508, at *6 (D. Colo. Sept. 9, 2021) are dissimilar. While the former contemplates a situation in which the employer had "employed numerous other employees before, during, and after the course of their pregnancies", John, 2025 WL 317515, at *9 n.8, the

---

[4] In any event, even under the White prima facie framework, a plaintiff must come forward with evidence establishing either "replace[ment] by a person outside the protected class or" different treatment than "similarly situated non-protected employees." White, 533 F.3d at 391. Because Colton neither replaced Patterson nor was an employee outside of Patterson's protected class, Spriggs's invocation of Colton's circumstances here matters little.

9

latter discusses the accommodations of various other pregnant employees in the context of the pretext, Rios, 021 WL 4124508, at *6. Here, where Spriggs admits that Colton was the *only* other pregnant employee Spriggs had prior to Patterson, its treatment of her is not dispositive on summary judgment to demonstrate Spriggs's views on pregnant employees. Given this, the Court need not delve into the parties' arguments on this matter further.

Turning to the parties' remaining arguments, there is sufficient evidence in the record to create a genuine dispute of material fact on whether there is a nexus between Patterson requesting a pregnancy-related accommodation and Spriggs terminating her the day after making such request. Much of this dispute turns on the timing of the events at issue. The parties agree that Patterson requested a week off for pregnancy-related health concerns on April 13, 2023, and that Jimmy Spriggs informed her she was fired the next day, on April 14, 2023. What the parties disagree on, however, is when Jimmy Spriggs made the decision: prior to, or after, receiving Patterson's request for a pregnancy-related accommodation.

The parties present conflicting evidence that is best resolved by a jury. On one hand, Spriggs points to deposition testimony from Jimmy Spriggs and Russel, testifying as a Rule 30(b)(6) witness, suggesting that the decision to terminate Patterson occurred on April 13, 2023, after Jimmy Spriggs learned that Patterson had approved an invoice using an incorrect billing code.[5] (See Doc. No. 37-4 at 148:5–10; Doc. No. 37-5 at 42:6–14). While Spriggs is correct that if the evidence establishes that Jimmy Spriggs decided to terminate Patterson prior to learning

---

[5] While Spriggs contends this is consistent with its May 22, 2025 supplemental interrogatory responses stating the same (Doc. No. 44 at 3), there is no evidence of such response in the record for the Court to consider. (See Doc. No. 37 (Spriggs filing only deposition testimony in support of motion for summary judgment)).

about her requested pregnancy accommodation there is "no evidence whatsoever of causality," Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001), the record is not so simple here.

Rather, Patterson points to evidence that Jimmy Spriggs made his decision to terminate her *after* learning of her pregnancy-related accommodation. Specifically, she cites to Jimmy Spriggs's deposition testimony, his email terminating Patterson, and Spriggs's September 30, 2024 interrogatory responses stating that the decision to terminate came the day after she requested a week off of work for her pregnancy-related health complications. (See Doc. No. 41-2 at 135:19–136:12 (Jimmy Spriggs testifying that he spoke with Russel about terminating Patterson the evening of April 13, 2023), id. at 139:17–20 (Jimmy Spriggs confirming that he received Patterson's PTO request on April 13, 2023 at 6:48 p.m.), id. at 178:7–18 (Jimmy Spriggs reading Patterson exit form that stated reason for her termination was his email to her), id. at 180:1–2 (Jimmy Spriggs testifying that Patterson's date of termination should have stated April 14, 2023 on exit form); Doc. No. 41-14 (April 14, 2023 email terminating Patterson); Doc. No. 41-13 at 4–5 (in response to the interrogatory "[s]tate when the decision was made to terminate [Patterson]," Jimmy Spriggs verified "April 14, 2023"); see also Doc. No. 41-2 at 203:23–24 (Jimmy Spriggs testifying that the correct date for the interrogatory asking when the decision was made to terminate Patterson was April 14, 2023)). Considering the conflicting sworn statements from Jimmy Spriggs on when he decided to terminate Patterson's employment, there is a genuine dispute of material fact on whether that determination was made before or after he learned of Patterson's pregnancy-related PTO request.

Viewing the evidence in Patterson's favor, and the close temporal proximity between Patterson's request for an accommodation and her termination, are sufficient to establish for summary judgment purposes the required nexus under the fourth element of her prima facie case.

11

While Spriggs is correct that temporal proximity between the pregnancy-related conduct and an employee's firing is not always enough on its own to show causation, the unpublished and non-binding authority cases it cites are inapposite here, as they that do not stand for the propositions Spriggs cites them for. See, e.g., Megivern v. Glacier Hills, Inc., 519 F. App'x 385, 396 (6th Cir. 2013) (holding district court did not err in finding nexus between plaintiff announcing pregnancy and her termination two months' later based on timing alone); McDowell v. Heartland Dental, LLC, 2017 WL 876177, at *2–3 (M.D. Tenn. Mar. 6, 2017) (granting summary judgment for defendant for retaliation claims where plaintiff admitted she did not engage in a protected activity); Zhu v. Vanderbilt Univ., 2007 WL 2963980, at * (M.D. Tenn. Oct. 5, 2007) (granting summary judgment for pregnancy discrimination claims where plaintiff could not show pretext, given defendant conceded that the plaintiff could establish a prima facie case of discrimination).

There is ample Sixth Circuit precedent that, if Patterson's evidence that Jimmy Spriggs decided to terminate her after learning about her PTO request is credited by a jury, the close temporal proximity between the two events establish the required nexus for the fourth element of her prima facie case. See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case[.]"); see also Asmo v. Keane, Inc., 471 F.3d 588, 594 (6th Cir. 2006) (two-month proximity between supervisor learning of plaintiff's pregnancy and her termination constituted sufficient temporal proximity "to establish a link between [plaintiff's] pregnancy and her termination"). Viewing the facts in Patterson's favor and considering the low burden on her at this stage of the case, Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000), the single day between Patterson requesting time

12

off for her pregnancy complications and her firing establish the causal nexus required here.[6]  See

Herra v. Churchill McGee, LLC, 545 F. App'x 499, 502 (6th Cir. 2013) (one month proximity was

sufficient to establish causal connection); Goller v. Ohio Dep't of Rehab. & Corr., 285 F. App'x

250, 257 (6th Cir. 2008) (two-month proximity was sufficient); Singfield v. Akron Metro. House.

Auth., 389 F.3d 555, 563 (6th Cir. 2004) (three-month proximity sufficient to establish causal

connection); see also Taylor v. Geithner, 703 F.3d 328, 339 (6th Cir. 2013) ("[I]f there is a very

close temporal proximity, then no other evidence is needed.").  Patterson need not provide any

other evidence to survive summary judgment on the fourth element of her prima facie case.

## B.  Legitimate, Non-Discriminatory Reason

Having satisfied the prima facie stage, the burden shifts to Spriggs to establish a legitimate,

non-discriminatory reason for terminating Patterson.  Spriggs easily satisfies this burden.  It cites

to evidence that Jimmy Spriggs did not fire Patterson due to her pregnancy-related accommodation

request, but instead, for her poor job performance that allegedly resulted in significant financial

impact and client rejection for Spriggs.  (See Doc. No. 36 at 10–14).  Patterson does not

meaningfully contest that Spriggs satisfies its burden here, so the Court need not delve into this

portion of the McDonnell Douglas test further.

## C.  Pretext

Given Patterson's prima facie case and Spriggs articulating a non-discriminatory reason

for termination, the burden shifts back to Patterson to show pretext.  Specifically, Patterson must

---

[6] Accordingly, the Court need not evaluate whether the other evidence Patterson proffers to establish causation, like Jimmy Spriggs's testimony comparing pregnancy to a "deficiency" (Doc. No. 41-2 at 164:16–165:24) and commenting that a fellow pregnant employee would need "a week or two" off after giving birth (id. at 80:21–23), could raise a genuine dispute of material fact on this issue.

come forward with evidence that true reason for her firing was her pregnancy and related accommodation request. To establish pretext, Patterson may show: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Chen v. Dow Chemical Co., 580 F.3d 394, 400 (6th Cir. 2009) (citing Hendrick v. W. Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004)). "To carry her burden in opposing summary judgment, [Patterson] must produce sufficient evidence from which a jury could reasonably reject [Spriggs's] explanation of why it fired her." Id. (citing Mickey, 516 F.3d at 526)).

"Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against h[er].'" Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (quoting Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003)). "Pretext, however, cannot be shown by attacking the decision itself." Hein v. All Am. Plywood Co., 232 F.3d 482, 490 (6th Cir. 2000) (citing Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 898 (6th Cir. 1997)). In other words, "a plaintiff's subjective interpretations or feelings are insufficient to establish pretext." Rosenthal v. Faygo Beverages, Inc., 701 F. App'x 472, 480 (6th Cir. 2017).

Patterson's first argument on pretext is that Spriggs's reason for terminating her lacks a basis in fact because there was no documentation of her unsatisfactory job performance. Specifically, the alleged performance issues were resolved prior to her termination. Further, there is no evidence that Patterson was actually responsible for some of the deficiencies Spriggs complains of. Regardless of whether Patterson is correct on any of these points, Spriggs has successfully rebutted any inference of pretext by its successful reliance on the employer's honest

14

belief rule. Under the "honest belief" rule, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision," it is entitled to deference on that decision even if the conclusion is "later shown to be mistaken, foolish, trivial, or baseless." Id. (citation and quotations omitted). Because Spriggs has presented evidence that: (1) its belief that Patterson had been performing deficiently was based in actual admissible facts, and (2) its decision to terminate Patterson for performance reasons was based on admissible facts showing the decision was "reasonably informed and considered," Patterson cannot challenge that determination now to defeat summary judgment. Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998); (Doc. No. 38 ¶¶ 29–32, 39, 41, 46, 48–49, 51–53). Accordingly, Patterson cannot show that Spriggs's non-discriminatory reason for terminating her had no basis in fact.

Patterson's second argument, that her alleged performance issues did not actually motivate her termination, fares better. (Doc. No. 38 at 15). In support, she again emphasizes her superiors' positive words about her work, and asserts that Jimmy Spriggs's email terminating her in response to her PTO request demonstrates his real motivation for firing her was that request. (Id.). Spriggs disagrees, arguing that Patterson's documented poor performance leading up to her termination and Jimmy Spriggs's email terminating her both show its motivations for firing Patterson are not pretextual. (Doc. No. 36 at 19). Patterson's proffered competing interpretation of the correspondence relating to her termination carries weight on summary judgment.

In that correspondence, Jimmy Spriggs states that he wanted to "finish up" their prior conversation about her performance, and that "[w]ith all the things that have gone on and us having to correct it[,] I believe it's best that we part ways." (Doc. No. 41-14 at 1). Jimmy Spriggs continued: "We are having to handle everything now and with the lack of communication coming from over there I don't feel it's a good situation for either of us." (Id.). There are two reasonable

competing interpretations of this exchange that are best considered by a jury, rather than this Court. On one hand, Spriggs argues that Jimmy Spriggs's comments are clearly made in the context of Spriggs's honest belief on Patterson's poor performance and Jimmy Spriggs's reference to his prior conversation about that poor performance. On the other, Patterson posits an alternative theory: that Jimmy Spriggs's email correspondence stating he "ha[s] to handle everything now" is, in essence, a complaint about her request for PTO. Viewing the email in Patterson's favor, as the Court is required to do, the timing and tenor of Jimmy Spriggs's email could cause a reasonable juror to at least question whether Patterson's request for PTO, rather than her poor performance at work, actually motivated her termination.

The Court need not determine whether this exchange is enough on its own to establish pretext, as Patterson proffers additional evidence that does so. For instance, Patterson contends that pretext is established because others were not fired for engaging in substantially similar conduct that Spriggs purportedly fired her for. Specifically, Patterson points to Patrick Britt ("Britt") and Rector, who were not fired for swearing at work and being involved with the April 11, 2023 invoice dispute, respectively. This shows that Spriggs did not fire them for engaging in similar conduct when compared to Patterson's alleged job deficiencies that led to her firing. While Spriggs argues that Britt and Rector held different positions at Spriggs and worked in different locations than Patterson, these things are not dispositive. Instead, the focus at the pretext stage is the "severity" and "commonality" of the employees' similar conduct. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 350 (6th Cir. 2012); see Colvin v. Veterans Admin. Med. Ctr., 390 F. App'x 454, 459 (6th Cir. 2010) (a plaintiff "is not required to show that h[er] proposed comparator's actions were identical to h[er] own").

To that end, Patterson has offered other evidence that "'other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" Jackson v. VHA Detroit Receiving Hosp., Inc., 814 F.3d 769, 779–80 (6th Cir. 2016) (quoting Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009)). While Patterson was fired in part for purportedly being disrespectful to a contractor, Britt testified that swearing at work was common amongst employees and contractors and that he had never been fired for it. (Doc. No. 41-6 at 25:16–18 (testifying that swearing onsite is common), 37:17–38:20 (testifying that him and Jimmy Spriggs had gotten into heated exchanges, yet Britt was not fired for it)). Further, Patterson also relies on Rector's deposition testimony showing that he was involved in the invoice dispute on April 11 that ultimately led to Patterson's termination but maintained his employment after the incident occurred. (Doc. No. 41-4 at 87:2–15, 89:18–23; Doc. No. 41-9 at 2 (Rector emailing Jimmy Spriggs, informing him that he and Patterson "did exactly" what they were told to do)).

Further, Patterson points to evidence that Spriggs failed to follow its own internal procedures in approving requests for time off as to Patterson, but not other employees. Patterson cites to Russel's corporate representative testimony stating that if an employee needs medical leave, he or she need only request it from Mr. Spriggs or Russel, with automatic approval if accompanied by a doctor's note. (Doc. No. 37-5 at 12:3–17). Patterson presents admissible evidence that she followed this procedure, yet Russel and Jimmy Spriggs failed to approve her request. (Doc. No. 41-1 at 46:15–56:25). By contrast, Patterson offers evidence that several male employees who had requests for medical leaves approved, even absent a doctor's note. For

instance, Jimmy Spriggs approved Rector for a medical leave to care for his sick mother without submitting any medical paperwork. (Doc. No. 37-4 at 185:1–186:7; Doc. No. 41-4 at 44:4–21). Should the jury credit Russel's and Jimmy Spriggs's failures to grant Patterson's doctor-supported request for PTO as a "failure to follow internal procedures," that "can be evidence of pretext," given Patterson has "shown that [Spriggs] applied the same standard differently to people in different . . . gender groups." Felder v. Nortel Networks Corp., 187 F. App'x 586, 595 (6th Cir. 2006) (citing Durante v. Ohio Civil Rights Comm'n, 902 F.2d 1568 (6th Cir. 1990) (per curiam)).

Spriggs contends that this evidence, even if credited, matters little considering the applicability of the same actor inference. Under Sixth Circuit precedent, "in cases where the hirer and firer are the same individual and the termination of the employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995) (citation and quotations omitted). Because Jimmy Spriggs both hired and fired Patterson, the same actor inference warrants the conclusion that discrimination did not motivate his decision to terminate Patterson's employment. However, this ignores the underlying reason for the inference, which reflects that "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire then once they are on the job." Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) (citation and quotations omitted). Critically, it is undisputed that Patterson was not pregnant when Jimmy Spriggs re-hired her in November 2022. He did not learn of her pregnancy until February 2023. (Doc. No. 39 ¶¶ 16, 26). Given this, the Court is not convinced Spriggs is entitled to the same actor inference, especially when Spriggs did not know Patterson belonged to the purportedly

18

disliked group (i.e., pregnant individuals) at the time Patterson was hired.  See Proud, 945 F.2d at 797.

Given the above, and viewing the facts in Patterson's favor, she has raised sufficient evidence to create a genuine dispute of material fact on whether Spriggs's rationale for firing her either did not actually motivate its decision or was insufficient to warrant it.  Accordingly, Spriggs's motion will be denied on Patterson's Title VII, THRA, and TN PWFA pregnancy discrimination claims.

### 2. ADA, TDA, and TN PWFA Disability Discrimination Claims

The Court turns to Spriggs's next argument for summary judgment, that it is entitled to judgment as a matter of law on Patterson's ADA, TDA and TN PWFA failure to accommodate claims.[7]  The Court will address them in turn.[8]

---

[7] Notably, Spriggs again fails to move for summary judgment on Patterson's disability discrimination and/or retaliation claims, which are separate from her failure to accommodate claims.  See Morrissey v. Laurel Health Care Company, 946 F.3d 292, 298 (6th Cir. 2019) (describing direct and indirect tests for failure to accommodate claims); Demyanovich v. Cadon Plating & Coatings, LLC, 747 F.3d 419, 433 (6th Cir. 2014) (requiring a showing that plaintiff suffered an adverse employment action for general disability discrimination claim); see also Morrissey, 946 F.3d at 298–99 ("Because 'not making reasonable accommodations' is listed in the ADA's definition of disability discrimination, see 42 U.S.C. § 12112(b)(5)(A), 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination'" and do not require proof of an adverse employment action) (quoting Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007)).  To the extent Spriggs attempts to argue that it is entitled to summary judgment on those claims for the same reason it is on Patterson's Title VII and ADA claims, (see Doc. No. 36 at 23), those arguments fail for the reasons stated herein.

[8] The Court need not substantively address Spriggs's motion on Patterson's TDA claim, given she does not raise a failure to accommodate claim under that statute, and her claim otherwise proceeds forward.  See supra, Section III.3.n.7; see also Sasser v. Quabecor Printing (USA) Corp., 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004) ("A claim brought under the [TDA] is analyzed under the same principles as those utilized for the Americans with Disabilities Act.").

19

Under Counts IV and V, Patterson alleges, in part, that Spriggs discriminated against her by failing to provide her a reasonable accommodation. Pursuant to the ADA and the TN PWFA, an employer must provide reasonably accommodations to an employee with a disability who is otherwise qualified for the position. See 42 U.S.C. § 12112(b)(5); Tenn. Code Ann. § 50-10-103.[9] To establish a prima facie case of a failure to accommodate claim, Patterson must demonstrate that: "(1) she 'had a disability 'within the meaning [of the statute]'; (2) 'she was otherwise qualified for' the position of employment, 'with or without reasonable accommodation'; (3) [Spriggs] 'knew or had reason to know' of the disability; (4) 'she requested an accommodation'; and (5) [Spriggs] 'failed to provide the necessary accommodation.'" Buggs v. FCA US, LLC, 2023 WL 2468378, at *5 (6th Cir. Jan. 20, 2023) (quoting King v. Steward Trumbull Mem'l Hosp. Inc., 30 F.4th 551, 560 (6th Cir. 2022)). "If [Patterson] makes this showing, then the burden shifts to [Spriggs] to show that the accommodation would cause undue hardship" for it. Id. As relevant here, Spriggs challenges the first, second, and fifth elements of Patterson's claim.

A. Whether Patterson Was Disabled

On the first element, Spriggs asserts that Patterson's pregnancy-related complications—high blood pressure and possible pre-eclampsia—are not disabilities because Patterson testified that she could still perform her job functions even with them. As Patterson correctly emphasizes,

_____

[9] While the TN PWFA does not define what constitutes a "disability," Patterson does not contest Spriggs's invocation of the federal Pregnancy Workers Fairness Act definition to provide helpful context, which provides for definitions of a "known limitation" that may be broader than the ADA's definition of disability. See 42 U.S.C. § 2000gg-1 (noting definition of "known limitation" includes limitations "whether or not such condition meets the definition of disability specified in section 3 of the Americans with Disabilities Act of 1990"); 29 C.F.R. § 1636.3(a) (same). Because the scope of the TN PWFA appears to encompass even more limitations than that under the ADA, the Court will consider those failure to accommodate claims together. Still, the Court cautions the parties shall be prepared to present the Court with the elements necessary to establish Patterson's TN PWFA failure to accommodate claim prior to trial, as their summary judgment papers suggest there is ambiguity on this issue.

20

the ADA imposes no such requirement on the first prong of the prima facie analysis. Rather, under the ADA, a disability constitutes "a physical or mental impairment that substantially limits one or more major life activities of such individual;" "a record of such impairment; or" "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A). Such "major life activities" are broad, and can include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Given these definitions, the evidence that Patterson offers to show she had a disability under 42 U.S.C. § 12102(1)(A) is sufficient to satisfy the first prong of her prima facie discrimination case. Patterson offers deposition testimony that she was diagnosed with and treated for chronic hypertension and pre-eclampsia in February 2023. (Doc. No. 37-1 at 95:15–96:18). Even with medication, however, Patterson's testimony demonstrates that she continued to suffer from "severe headaches," "nausea," "[poor] vision," and "sleep[iness]." (Id. at 97:18–21). Viewing this evidence in Patterson's favor, a jury could reasonably find that Patterson's chronic hypertension and pre-eclampsia, even treated with medication, substantially limited major life activities like eating, sleeping, and caring for herself, despite her ability to continue working. Accordingly, there is a genuine dispute of material fact on the first element that a jury must decide.

### B. Whether Patterson Was Otherwise Qualified

The result is the same for Spriggs's arguments on the second element of Patterson's failure to accommodate claims, that Patterson could perform the essential functions of her role with or without accommodation. Per the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered

evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Because it is undisputed that Spriggs did not have a written description of Patterson's job prior to hiring, the Court must consider Spriggs's judgment on what functions of her job were essential.

But Spriggs is not clear on this issue. Spriggs generally asserts that various pieces of evidence show Patterson's failures on the job and that she could not perform her essential job duties. (See Doc. No. 39 ¶¶ 39, 46, 51–53). In return, Patterson offers various pieces of evidence calling this determination into question. For instance, she points to Rector's testimony that her primary responsibilities were over the Charter and AT&T drop removal contracts, of which she had no performance issues with. (Doc. No. 41-4 at 74:1–5, 87:2–15, 89:18–23). Further, she points to evidence that Jimmy Spriggs did not express concerns about her performance at work under Rector's supervision (Doc. No. 37-4 at 62:7–25), and that none of her supervisors met with her to discuss performance problems. (See, e.g., id. at 132:15–19). Viewing these pieces of evidence in Patterson's favor, and considering the vague nature of Spriggs's arguments on this point, a reasonable juror could find that Patterson was qualified to perform the essential functions of her job.

### C. Whether Spriggs Failed to Provide the Necessary Accommodation

On the fifth element of Patterson's failure to accommodate claims, Spriggs argues that it did not fail to provide the necessary accommodation because its decision to terminate her had already been finalized by the time Patterson requested her accommodation. In support, Spriggs relies on a non-binding, unpublished opinion from an out-of-circuit district court, Gonzales v. Faithful+Gould, Inc., 2017 WL 6559905, at *5 (E.D. Va. Dec. 22, 2017). There, the Gonzales court found that the plaintiff could not establish a failure to accommodate claim under the ADA when, by the time of the plaintiff's request for accommodation, the defendant "had already made

a decision to terminate plaintiff." <u>Id.</u>  As a result, the defendant "was no under no obligation to offer plaintiff a reasonable accommodation after making a decision to terminate him and after plaintiff had already engaged in terminable misconduct." <u>Id.</u>  The <u>Gonzales</u> court's conclusion, while logical, holds little water in the instant case, where there is a genuine dispute of material fact on whether Jimmy Spriggs decided to terminate Patterson before or after receiving her request for accommodation.  <u>See</u> <u>supra</u>, Section III.1.C.  Given there is a genuine dispute of material fact on this issue, and that this is the sole remaining argument Spriggs makes on these claims, its motion on Patterson's failure to accommodate claims will be denied.

    3.  <u>Damages</u>

    Spriggs's final argument for summary judgment is on the proper scope of Patterson's back pay recovery.  On this issue, Spriggs asserts that Patterson's claim for back pay is barred because she has failed to mitigate her damages by conducting an inadequate job search, declining available work, and voluntarily withdrawing from the labor market.  (Doc. No. 36 at 42).  Patterson does not respond to any of Spriggs's arguments on this issue, presumably based on her belief (unsupported by any legal citation) that a party cannot get summary judgment on the scope of damages.  (<u>See</u> Doc. No. 38 (omitting discussion on damages); <u>see also</u> Doc. No. 39 ¶¶ 83–88 (stating that damages facts are "not material fact[s] regarding Spriggs liability at the summary judgment stage")).  It goes without saying that Patterson's view that the Court cannot address Spriggs's failure to mitigate affirmative defense at summary judgment is wrong.  Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or *defense*—or the part of each claim or *defense*—on which summary judgment is sought.") (emphasis added); <u>see</u> <u>Holloway v. Dodge</u>, 2019 WL 3891852, at *2 (S.D. Ohio Aug. 19, 2019) ("[W]hile it is typically

raised by the employer, mitigation of damages is routinely addressed on summary judgment.")
(collecting cases). The Court will therefore consider Spriggs's damages argument here.

A plaintiff seeking damages in an employment discrimination case, such as Patterson, must use reasonable diligence to obtain substantially equivalent employment after termination. Ford Motor Co., 458 U.S. 219, 231–32 (1982); see Ford v. Nicks, 866 F.2d 865, 873 (6th Cir. 1989) (Title VII "adopts a traditional rule on mitigation of damages."); 42 U.S.C. § 2000e–5(g). Spriggs, as the employer, carries the burden of establishing that "there were substantially equivalent positions which were available" and that Patterson "failed to use reasonable care and diligence in seeking such positions." Rasimas v. Michigan Dep't of Mental Health, 714 F.2d 614, 624 (6th Cir. 1983) (citations omitted), cert. denied, 466 U.S. 950 (1984). Patterson's diligence must be evaluated considering her "individual characteristics" and "the job market." Id. To that end, "[a]n employee is not required to go to heroic lengths to mitigate his damages, but only to take reasonable steps to do so." Ford, 866 F.2d at 873.

With these legal standards in mind, Spriggs's attempts to show that Patterson did not take reasonable care and diligence in seeking new, substantially equivalent employment fall short to warrant summary judgment. The evidence Spriggs cites to—that Patterson submitted only 15 job applications over the course of more than a year post-termination (Doc. No. 37-1 at 177:23–25), Patterson's self-imposed limitations to her job search (id. at 176:2–22), her declining work (id. at 167:5–168:23), and her purported "withdraw" from the labor market (id. at 175:6–18)—fails for multiple reasons. First, and critically, none of that evidence speaks to whether Patterson had access to "substantially equivalent positions which were available" that she failed to diligently pursue. See Rasimas, 714 F.2d at 624. Second, the only evidence that Spriggs cites to that could speak to Patterson's failure to make reasonable efforts to obtain employment is her deposition testimony.

Spriggs relies on Patterson's testimony that she had "taken the role of being at home" by February 2024, but that is a mischaracterization of the record. (See Doc. No. 37-1 at 175:6–24 (**Q:** "[W]hat happened in February of '24?" **A:** ". . . [A]fter applying for all the positions and trying to find something that would work and finding no job that would work with our situation, I kind of took the role of being at home as my work." **Q:** "And when did you make that decision?" **A:** "Probably in February or March of '24." . . . **Q:** "And when you made that decision, did you stop looking for work?" **A:** "I was *still* looking. I just was not breaking my back like I was." **Q:** "Okay. And so are you still looking now?" **A:** Yes, ma'am. *I still occasionally look for a job*.") (emphasis added)).

Because these pieces of proffered evidence do little to demonstrate that there is no genuine dispute of material fact that Patterson did not mitigate her damages based on her individual characteristics and the applicable job market, Spriggs's motion on this issue fails. See Rasimas, 714 F.2d at 624. Without carrying its burden, Patterson is under no legal obligation to provide evidence raising a genuine dispute of material fact on her job search efforts. See Pittington v. Great Smoky Mountain Lumberjack Feud, LLC, 880 F.3d 791, 801 (6th Cir. 2018) (plaintiff under no obligation to demonstrate she sought or obtained comparable employment after termination where "a defendant has offered no evidence indicating that substantially equivalent positions . . . were available and that the claimant failed to use reasonable care and diligence in seeking such positions") (citation and quotations omitted). At bottom, given the inadequate record before the Court, whether Patterson failed to mitigate her damages is most appropriately evaluated by the jury at trial.

## IV.     CONCLUSION

For the foregoing reasons, Spriggs's Motion for Summary Judgment (Doc. No. 35) will be denied, and this case will proceed to trial in September as scheduled.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE